AO 91 (Rev.11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
## Eastern District of Washington

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| v.. | ) Case No. 1:14-MJ-4008 |
| WILLARD MALDONALDO, and AUSTIN PHILLIPS | ) 1:14-MJ-4009 |

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
JAN 2 8 2014
SEAN F. McAVOY, CLERK
_____ DEPUTY
YAKIMA, WASHINGTON

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of January 27, 2014, in the county of Klickitat in the Eastern District of Washington, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 16 U.S.C. § 668(a) | Violation of the Bald and Golden Eagle Protection Act |

This complaint is based on these facts:

**Count 1**

On or about January 27, 2014, in Klickitat County, in the Eastern District of Washington, **WILLARD MALDONALDO** and **AUSTIN PHILLIPS** did knowingly or with wanton disregard for the consequences of their actions and without being permitted to do so as required by law, take a bald eagle in violation of the Bald and Golden Eagle Protection Act, Title 16, United States Code, Section 668(a).

**Count 2**

On or about January 27, 2014, in Klickitat County, in the Eastern District of Washington, **WILLARD MALDONALDO** and **AUSTIN PHILLIPS** did knowingly or with wanton disregard for the consequences of their actions and without being permitted to do so as required by law, take a golden eagle in violation of the Bald and Golden Eagle Protection Act, Title 16, United States Code, Section 668(a).

☑ Continued on the attached sheet.

_____
*Complainant's signature*
Charles W. Roberts, Special Agent, FWS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: January 28, 2014

_____
*Judge's signature*
James P. Hutton, United States Magistrate Judge

City and state: Yakima, Washington

P40128jm.TOA

Affidavit in Support of Complaint
AUSA: Timothy J. Ohms

# AFFIDAVIT

I, Charles W. Roberts, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.    I am a Special Agent with the United States Department of Interior, Fish and Wildlife Service ("the Service" or "USFWS"), Office of Law Enforcement, and I have been so employed since May 1993. Prior to beginning my employment with the Service, I was a Wildlife Agent for the Washington Department of Wildlife for approximately 4 years. I have a Bachelor of Science Degree in Wildlife Biology from Texas A&M University (1987), and I am a graduate of the Criminal Investigator Training Program and the USFWS Special Agent Basic School at the Federal Law Enforcement Training Center (1993). As part of my current duties, I investigate violations of federal criminal laws, including violations of the Bald and Golden Eagle Protection Act, 16 United States Code Section 668(a).

2.    The Bald and Golden Eagle Protection Act, 16 U.S.C. § 668, makes it unlawful to take, possess, sell, purchase, barter, offer to sell, purchase or barter, or to transport at any time or in any manner, any bald eagle (Haliaeetus leucocephalus) or any golden eagle (Aquila chrysaetos), alive or dead, or any part, nest or egg thereof. I have read the Bald and Golden Eagle Protection Act, 16 U.S.C. § 668, and note that the Bald eagle (Haliaeetus leucocephalus) has been under protection of this Act since June 8, 1940, and the Golden eagle (Aquila chrysaetos) has been under protection since October 24, 1962.

3.      The Bald and Golden Eagle Protection Act 16 U.S.C. § 668 provides an exception to the Act for members of federally recognized Indian Tribes who apply for a permit through the U.S. Fish and Wildlife Service National Eagle Repository. Permit applicants can apply to receive an eagle or eagle parts from the Repository for use in cultural and religious ceremonies. This exception does not allow for the taking, trading, bartering or sales of the eagles, their parts or products. In other words, there is no lawful authority, Native American or otherwise, for the commercial distribution of Eagles and/or their parts.

4.      The Bald and Golden Eagle Protection Act, 16 U.S.C. § 668, also provides that a federally recognized Native American may also apply for a permit to kill either a Bald or Golden Eagle. On March 11, 2013 I contacted Jennifer Miller with U.S. Fish and Wildlife who is the permit coordinator for Region One; which includes Idaho, Oregon, Washington, and Hawaii. Ms. Miller said no one in Region One has ever successfully obtained a take permit for bald or golden eagles. Miller explained there are two such permits in the southwestern region and one in the mountain states region.

5.      Under the Federal Regulations applicable to the Bald and Golden Eagle Protection Act (Eagle Act) 16 U.S.C. § 668 (e.g., 50 C.F.R. § 22.22(b)(1)), Native Americans can hand down lawfully obtained eagle feathers from one generation to another in accordance with tribal or religious customs. In addition, under policies applicable to the U.S. Fish and Wildlife Service, Native Americans are not subject to federal investigation for mere possession of eagle feathers. There are no exceptions, however, to the prohibition in the Eagle Act against the sale of eagle parts and feathers. The current investigation of Willard P. Maldonado involves evidence of taking of Bald and Golden eagles for commercial purposes

Affidavit in Support of Complaint - 2

and of the offering for sale and selling of these eagles, all of which is in violation of the Eagle Act and the Lacey Act.

6. The general Conspiracy statute, 18 U.S.C. § 371, makes it unlawful for two or more persons to conspire to commit any offense against the United States, or to defraud the United States or any agency thereof in any manner or for any purpose, if one or more of such persons does any act to effect the object of the conspiracy.

7. The Yakama Nation Wildlife Code Section 32.110.09 is a Yakama Tribal Law which states "no person shall, hunt, take or possess an eagle, eagle part, nest or egg in violation of the Bald and Golden Eagle Protection Act 16 U.S.C § 668 unless undertaken in furtherance of religious or ceremonial practices as permitted by the U.S. Fish and Wildlife Service . . . ."

8. I know from my training and experience that among many Native American communities, Bald and Golden eagles are highly regarded for religious ceremonies and as part of competitive powwow dance "regalia."

9. Also, I know from my training and experience that within the Native American powwow circuit, eagle feathers are made into or incorporated into "regalia," which is the dance wardrobe specific to certain dances and tribes. During a powwow, dancers can win prize money based upon scoring of their dancing styles and techniques as well as on the construction of the regalia and the appearance of the feathers incorporated into the regalia.

10. Also, I know from my training and experience that, among Native Americans; immature Golden eagle tail feathers are called "black and whites" due to their being black on the tip and white on the base of the feather. These feathers

are highly sought after on the Native American powwow circuit and are the most desired color phase for use in the construction of regalia. As a result, they are higher in price on the illegal ("black") market. The black market value of parts and products of dead Bald and Golden eagles varies depending upon their species and coloration. An unworked pair of eagle wings with generally less desired color phases can sell for between $200 and $400. Full unworked tails of eagles, with a more desired color phase, can sell for thousands of dollars each. I also know from my training and experience that golden eagles are often referred to in slang on social networking sites, email, and text messages as "b&w's" or similar forms of abbreviation.

11. My training and previous, similar investigations have taught me that persons in the Yakima area who take and traffic in eagles and their parts do most of their collecting in the late fall through early spring months. This is partly due to the fact that eagles are migrating through or wintering in the area during these months so a larger number are available for harvesting. The other reason is that most of the major powwow events are held in the spring and summer months. These "eagle hunters" can collect numerous birds and process them so that they then have a large amount of product available for sales at the various large powwows throughout the nation.

12. I am one of the law enforcement personnel conducting the investigation that led to the filing of a Criminal Complaint charging Willard P. Maldonado and Austin H. Phillips with knowingly, or with wanton disregard, taking and possessing a bald and a golden eagle in violation of the Bald and Golden Eagle Protection Act, Title 16, United States Code, Section 668(a). I have received information from other law enforcement officers and witnesses during the course of this investigation. While I have not included every fact known to the

investigation, I have provided facts necessary to establish that probable cause exists for a violation of the charged offense, and the forfeiture of assets consistent with statutory authorization.

## BACKGROUND INFORMATION

13. In early winter 2013, Sgt. Jeffrey Wickersham and other Washington state officers as well as your affiant documented the presence of numerous deer carcasses in and around the Glenwood Canyon area of Klickitat County in the Eastern District of Washington. Investigation revealed that many of the carcasses had been shot and the carcasses left or dropped in areas within close proximity to roadways. On January 13, 2013, Officer Taylor Kimball of the Washington Department of Fish and Wildlife reported that he contacted Willard P. Maldonado at milepost 10 on the Glenwood Highway in Klickitat County, Washington. Officer Kimball said that he observed an Indian male standing outside a Chrysler Sebring (WA LIC: 513ZLF). Another Indian male was walking down the hill towards the vehicle. Kimball contacted Maldonado, who said that they saw a large deer and were placing a trail camera in the area. Upon further questioning, Kimball discovered a loaded .22-250 caliber rifle inside the vehicle. Officer Kimball issued a citation to Maldonado, charging him with having a loaded rifle in a motor vehicle. Maldonado was ordered to appear in Goldendale District Court on February 7, 2013, at 1:30 p.m.

14. On January 27, 2013, WDFW Officer Dan Bolton reported that he collected a bald eagle carcass near what appeared to be three illegally killed deer carcasses located up a hill from milepost 21 on State Hwy 142 near Goldendale, Washington. Bolton said that the eagle appeared to have been shot.

Affidavit in Support of Complaint - 5

15. On January 30, 2013, Officer Bolton and I surveyed the scene at m.p. 21 of State Hwy 142. I placed a time lapse video camera where a suspect who was hunting eagles feeding on the deer carcasses would most likely stop to either look for birds of prey or to take a shot at any such birds of prey. The camera is designed to take a photo every 5 seconds during the daylight hours.

16. Also on January 30, 2013, Officer Bolton and I found another deer carcass lying on a hillside near the Glenwood Hwy at m.p. 16.5. This is the same location where I investigated a suspiciously killed deer carcass in February of 2011. At that time, in close proximity to the deer carcass, I also found a golden eagle carcass with the tail feathers, wing feathers, talons, and plumes removed.

17. On January 31, 2013, Officer Bolton reported that he received a call from a concerned private individual who said that they were driving down Hwy 142 near m.p. 21 and saw a dark sedan stopped near the location of the dead deer carcasses. When the sedan saw the reporting party approaching, they departed and pulled over in a nearby turnout. The reporting party recorded the license number as WA License 513ZLF. This is the same license as the vehicle stopped by Officer Kimball on January 13, 2013, in which he cited Willard Maldonado for having a loaded gun in a motor vehicle.

18. On February 4, 2013, I retrieved the camera placed at m.p. 21. I reviewed the images on February 5, 2012. The images revealed that on January 31, 2013, at approximately 4:44 p.m. a dark sedan closely resembling a Chrysler Sebring drove slowly down the hill at m.p. 21. A freeze frame revealed a light colored emblem on the trunk of the vehicle which closely resembled the emblem found on Chrysler Sebring's. When it approached the location where a person could get a good view of the deer carcasses or shooting area, the vehicle stopped

and backed up. Approximately 45 seconds later the vehicle continued down Hwy 142. At approximately 5:36 p.m. what appeared to be the same dark sedan appeared and drove very slowly passed the scene. A freeze frame revealed a side view of the tail lights, which, when compared to other vehicles, appeared to be very similar to the side view of the tail lights of a Chrysler Sebring. The vehicle disappeared from view at approximately 5:37. Approximately 45 seconds later a person wearing a grey hoody sweatshirt appeared leaning on the opposite side of the guardrail. The person walked along the opposite side of the guardrail and then crossed over. When approximately ½ ways across the road, the person turned around, appeared to pick something up, and then went back under the guardrail. Approximately 30 seconds later, the person again appeared on the opposite side of the guardrail, leaned on it for several seconds, then crossed the road and walked up hill toward the carcasses. Approximately 15 minutes later, a car appeared going downhill and appeared to brake near the viewing/shooting area. At that time the camera turned off as it is designed to turn off during darkness.

19.     On February 7, 2013, I spoke with Klickitat County Sheriff Deputy Harold Cole and asked if he could determine if Maldonado showed up for his scheduled court proceedings. Cole called me and said that a dark Chrysler Sebring WA License 513ZLF was in the parking lot. The front Washington license plate on the Chrysler Sebring read 657 WWT. Cole reported that this plate was supposed to be attached to a red Mitsubishi Mirage registered to Willard Maldonado. Cole said that Maldonado was in court. Upon departing the court, Maldonado entered the vehicle and another Indian male later identified as Wayne White drove. As the vehicle left the courthouse, it drove west on Hwy 142. A Klickitat County Deputy stopped the vehicle to ascertain the reason for the different license plates. The Deputy identified the driver as Wayne C. White and

the passenger as Willard Maldonado. The Deputy cited Wayne C. White for not having a valid operator's license. During the contact Maldonado told him that the plate on the front of the vehicle was different because the Sebring's original plate apparently fell off in a car wash. After being released, the vehicle continued westbound on Hwy 142.

20.     On February 15, 2013, Washington Department of Fish and Wildlife Officer Dan Bolton contacted Maldonado, Austin PHILLIPS, and Wayne C. WHITE in a remote area of the Klickitat River drainage in Klickitat County in the Eastern District of Washington. Officer Bolton observed the individuals parked in a vehicle matching the description of the previously described Chrysler Sebring. Officer Bolton observed that the vehicle did not have the previously described plate numbers but surmised that the owner may have obtained new plates pursuant to the warnings he received from the Klickitat County Deputy on February 7, 2013. The current plates read Washington License AKX4675.

21.     Officer Bolton approached the subjects and asked if they were hunting. Maldonado told Bolton that they were hunting bobcats. Officer Bolton requested permission to inspect their firearms. Maldonado retrieved two rifles from the rear seat of the vehicle, which were unloaded as required. Officer Bolton asked if they had any game in the vehicle. Maldonado said that he did not, but he agreed to allow Officer Bolton to look in the trunk of the vehicle. Maldonado opened the trunk and Officer Bolton observed the parts of several eagles, including wings and assorted feathers both loose and in plastic bags. He asked Maldonado about the eagles, and Maldonado said that he makes costumes for others and all the eagles were given to him by other Native Americans who had permits to possess them. Maldonado said that he did not have copies of the permits or a letter

authorizing him to possess the eagles. Maldonado also did not provide the names of the persons to whom the eagles allegedly belonged.

22. At 1620 hours, Officer Bolton read Maldonado his Constitutional Rights from a form that Maldonado said he understood. Maldonado signed the form and agreed to talk to Officer Bolton. During questioning, Maldonado told Officer Bolton that there were parts of six golden eagles in the trunk of his vehicle. Maldonado continued to assert that the eagles came from different families who had permits, but he could not provide the names of these families. Officer Bolton confronted Maldonado by saying that he did not believe the story about the eagles being associated with permits from other families. Maldonado asked about the penalties associated with hunting eagles. Officer Bolton asked if Maldonado killed the eagles, and Maldonado replied "I will take responsibility for the eagles in the trunk." Maldonado did not directly say he "killed" the eagles in the trunk.

23. Officer Bolton told Maldonado that he was going to secure the car pending a search warrant and offered to transport Maldonado and his companions to Goldendale. During the ride to Goldendale, Maldonado showed Officer Bolton some photos of elk on his cellular phone. Maldonado talked about a particularly large bull elk photo. While scrolling through the photos, Officer Bolton saw photos of Indian regalia that appeared to be manufactured in part from eagle feathers. Officer Bolton continued to question Maldonado about the origin of the eagle feathers in his trunk. As Officer Bolton began to question Maldonado more in depth, Maldonado said that he would like to get some advice about what to say, at which point Officer Bolton ceased questioning.

24.     Officer Bolton advised Maldonado that he was going to secure the vehicle and Maldonado's cellular phone as evidence pending the issuance of a search warrant for the vehicle and the phone.

25.     On February 18, 2013, I requested a registration check through the Washington State Patrol for Washington License AKX4675. The license number is to a 2007 Chrysler Sebring registered to Willard Maldonado at 408 W. Pine St #104 Union Gap, WA. The record revealed that the license was issued in February of 2013.

26.     On May 15, 2013, numerous Special Agents from the U.S. Fish and Wildlife Service, Washington Department of Fish and Wildlife Officers, Immigration and Customs Enforcement Agents served several search warrants on various residences belonging to or periodically occupied by Willard P. MALDONADO and/or Austin H. PHILLIPS. Both MALDONADO and PHILLIPS were contacted during the warrant service and were aware of the purposes of the investigation to date. During the warrant service numerous parts of bald and golden eagles were seized from MALDONADO as well as cellular phones, computers and other evidence indicating that MALDONADO is involved in the illegal trafficking and killing of Bald and Golden Eagles.

27.     The analysis of the computer and cellular phone forensics is still ongoing thus no charges have yet been filed pursuant to the contact in February 2013 or the service of search warrants in May 2013.

RECENT INVESTIGATIVE EVENTS

28.     On January 27, 2014, Washington Department of Fish and Wildlife Sergeant Jeff Wickersham told me that while he was patrolling the Glenwood

Affidavit in Support of Complaint - 10

Highway area of Klickitat County in the Eastern District of Washington he encountered Willard Maldonado and Austin Phillips in possession of a freshly killed bald eagle and golden eagle. Sgt. Wickersham said Maldonado and Phillips were in the Glenwood Canyon area of Klickitat County and were in the same Chrysler Sebring sedan they were contacted last February by Officer Bolton. Sgt. Wickersham was again investigating the presence of numerous dead deer carcasses. The fact pattern associated with these deer carcasses was identical to the pattern of deer carcasses investigated and described in the paragraphs above.

29. Sgt. Wickersham provided the following information about this contact to me at the scene on January 27, 2014 and again in his case report which I used to prepare this portion of the statement of facts.

30. Sgt. Wickersham reported that at about 10:45 hours on January 27, 2014 he contacted two whitefish fishermen on the Klickitat River who informed him of two dead deer along the Glenwood Highway south of the Stinson Campground entrance road. One of the fishermen stated one of the deer was obviously shot. With Sgt. Wickersham during the contact was off-duty Goldendale PD Officer Dwayne Matulovich who was riding with him for the day. Sgt. Wickersham immediately thought of Maldonado and believed he may be back in the area continuing the same practices as observed in 2013.

31. Sgt. Wickersham drove to the location described by the fishermen where Officer Matulovich and he observed three dead deer on well exposed slopes north/east of the highway. They walked to one deer which was only 30-50 feet off the highway and Sgt. Wickersham believed it had been dead no more than 24-48 hours and scavenging by other animals had just begun.

Affidavit in Support of Complaint - 11

32.     At 12:34 hours, while driving northbound on the Glenwood Highway back to the area, a dark colored Chrysler Sebring sedan approached Sgt. Wickersham driving at a high rate of speed southbound. The roads were icy and it was only 24-26 degrees. As the vehicle passed, Sgt. Wickersham could see the driver through the front windshield and believed this to be Maldonado and he was driving the same car as he was in 2013. Sgt. Wickersham quickly turned around, finding that Maldonado was no longer on the highway. Sgt. Wickersham drove south on the highway where he observed fresh tire tracks through the frost going into a private driveway. Sgt. Wickersham turned into the driveway and drove in.

33.     Maldonado was going around a round-about at a private residence and was now driving towards him. Sgt. Wickersham exited his patrol vehicle and watched as the passenger tossed a firearm into the back seat. Maldonado rolled down his window. Sgt. Wickersham said to Maldonado "Aren't you suspended?" Maldonado responded, saying "Yeah." Sgt. Wickersham ordered Maldonado and the passenger (later identified as Austin Phillips) to get out the vehicle. Sgt. Wickersham asked what they tossed into the back seat. Sgt. Wickersham believes Phillips stated they were checking to make sure the rifle was not loaded. Sgt. Wickersham asked if there were other firearms in the vehicle. Sgt. Wickersham was told there were but they were all unloaded. Sgt. Wickersham asked to quickly inspect that they were unloaded and was given permission. Sgt. Wickersham found two rifles in the back seat, both of them unloaded. Sgt. Wickersham did not verify make or caliber.

34.     Sgt. Wickersham walked around the car, Washington registration AKX4675, to the passenger side where both Maldonado and Phillips were standing. Sgt. Wickersham saw a very fresh drop of blood on the bumper. Fresh handprints were on the trunk lid which had removed the road dust/grime and the

blood spot was on top of this layer of grime. Sgt. Wickersham asked Maldonado and Phillips why there was blood on the bumper and was told they had harvested a deer the day before and it must be from that. Based upon his experience and training Sgt. Wickersham believed the blood was fresh, not a day old, because it had not lost its red color. Sgt. Wickersham told Maldonado and Phillips that he didn't believe them.

35. Sgt. Wickersham advised them of their Constitutional Rights at about 12:40 hours. Maldonado and Phillips stated they understood their rights and would speak to him. Sgt. Wickersham obtained ID from Phillips and Maldonado had none. Sgt. Wickersham ran both with WSP radio finding Maldonado was suspended/revoked 2nd and Phillips was suspended 3RD.

36. Sgt. Wickersham began questioning Maldonado and Phillips, asking them what was in the trunk. At first Sgt. Wickersham was told they had nothing. As Sgt. Wickersham continued questioning, he told them he had found several fresh dead deer along the Glenwood Highway and he believed they were back in the area killing eagles, just like last year. After they continued to deny the allegations, Sgt. Wickersham advised them that he was interested in searching the vehicle and that he intended to apply for a search warrant based on his observations if they were not interested in consenting to the search.

37. They asked if Sgt. Wickersham was going to take them to jail or impound the car. Sgt. Wickersham advised that if he applied for and was granted a search warrant he wouldn't be impounding the car, but he couldn't promise them anything as he didn't have the authority. As for going to jail, he advised he would not be booking, but he could book Maldonado based on driving while suspended/revoked 2nd. Maldonado and Phillips asked if they could talk about it

for a minute. Sgt. Wickersham allowed them to speak privately but still in close proximity. After 2-3 minutes, they walked back toward him and Sgt. Wickersham asked what they had decided. Phillips first said that "You're not going to need a search warrant." Sgt. Wickersham asked Maldonado, as it was his vehicle, what his decision was. Maldonado said he would give consent to search the trunk, as long as Sgt. Wickersham promised not to tow the car. Sgt. Wickersham told Maldonado he couldn't promise anything, but he was being cooperative and Sgt. Wickersham really didn't want to tow the vehicle.

38.  Sgt. Wickersham retrieved a consent to search form from his vehicle and prepared it in Maldonado's presence. Sgt. Wickersham asked Maldonado if he remembered his Constitutional Rights as he had read them. Maldonado stated he did. Sgt. Wickersham advised, based on the form, that Maldonado had the right to refuse the search of his vehicle, restrict the search, and revoke the search at any time. Further, Sgt. Wickersham made it clear to Maldonado that Sgt. Wickersham had made no promises or threats of any kind. Maldonado agreed to the search of his vehicle, specifically the trunk, and allowed Sgt. Wickersham to search for and seize any wildlife or wildlife parts. Maldonado signed the form at about 13:10 hours, and Phillips signed the consent form as a witness. Officer Bolton arrived on scene around this time.

39.  Sgt. Wickersham took photographs of the vehicle and the blood spot before the trunk was opened. Sgt. Wickersham asked Maldonado to open the trunk. Maldonado hesitated, looked at Phillips, and Phillips stated there were two eagles and he was responsible for them. Maldonado opened the trunk and Sgt. Wickersham observed two eagles on a blue tarp on top of the spare tire. Sgt. Wickersham took photographs of the eagles, then he inspected them. Both were warm to the touch under the wings.

Affidavit in Support of Complaint - 14

40.     As Sgt. Wickersham was inspecting them, Phillips stated they saw one eagle dead on 1/26/2014 and came back to grab it today so it "...wouldn't go to waste." Phillips stated that when he retrieved the first eagle, he saw the other laying the ground and retrieved it too. Sgt. Wickersham noted the warmer of the two eagles was still dripping fresh blood and had a large gunshot wound in the chest area. It was obvious it had just been shot.

41.     Several facts Sgt. Wickersham consider prior to deciding how to proceed were: 1 - Both eagles were warm, not frozen, 2 - Both eagles were not in rigor mortis, 3 - Ambient temperatures were hovering around 25-26 degrees, with cooler temperatures during the previous night, 4 - Both eagles exhibited gunshot wounds, 5 - multiple small caliber rifles were in the vehicle

42.     Officer Bolton interviewed Phillips while Sgt. Wickersham called me to brief him on the incident. Sgt. Wickersham advised he was planning on charging the subjects in State court. Given the previous investigation of Maldonado and Phillips I asked that Sgt. Wickersham refer the charges to me. Sgt. Wickersham agreed with referring them.

43.     I asked Sgt. Wickersham to hold them because I was going to travel from Tri-Cities to the location, seize and impound the car, and book both subjects into jail in Yakima. Sgt. Wickersham returned and advised both Maldonado and Phillips of his conversation with me and my decision on impounding the car and that I was planning on booking them into the Federal Jail in Yakima.

44.     Sgt. Wickersham wanted to get an internal temperature of the eagles to better determine time of death. Using a meat thermometer Sgt. Wickersham borrowed from the landowner in the area, Robert Blake, Sgt. Wickersham measured the internal temperatures with Officer Bolton at about 14:00 hours. The

golden eagle with the large chest wound was 90 degrees, measured in the cloaca, and the other eagle measured about 50 degrees in the cloaca. Based on several charts that Officer Bolton and Sgt. Wickersham referenced, it placed time of death of the golden eagle, given ambient air of 30 degrees, about 1.5-2 hours prior. The colder eagle time of death was at least 6 hours earlier. The charts they used were for game birds, not eagles, but it gave a basis for comparison.

45. At about 1545 hours, I arrived on the scene. The tow truck was loading Maldonado's Chrysler Sebring, WA License AKX4675 which is identical to the vehicle used in the violations documented in February 2013. I instructed the tow truck driver to transport the vehicle to the WDFW secure evidence facility in Goldendale. I chained the vehicle over to Officer Dan Bolton pending receipt of a search warrant for the vehicle. I next contacted Austin Phillips and seized his cellular phone. I then requested that Officer Richard Bare of the U.S. Fish and Wildlife Service contact Maldonado. Officer Bare seized two cellular phones from Maldonado's person.

46. I next inspected and seized the two eagle carcasses which Sgt. Wickersham had removed from the vehicle. I then arrested Willard Maldonado and placed him into my vehicle for transportation to the Yakima County Detention Center. Officer Bare arrested Austin Phillips and placed him his vehicle for transportation to the Detention Center. During the trip to the jail Maldonado said he did not wish to be questioned about the incident. During small talk Maldonado told me that Austin Phillips was taking responsibility for the eagles. Maldonado said he would not have been present except for the fact that Phillips agreed to purchase a full tank of gas for Maldonado's car.

47.     Based on the above information, I have probable cause to believe that Willard Maldonado and Austin H. Phillips did knowingly or with wanton disregard for the consequences of their actions and without being permitted to do so as required by law, take a bald and golden eagle in violation of the Bald and Golden Eagle Protection Act, Title 16, United States Code, Section 668(a).

Respectfully submitted,

Charles W. Roberts
Special Agent, Fish and Wildlife Service

SUBSCRIBED AND SWORN to before me this  28  day of January, 2014.

James P. Hutton
United States Magistrate Judge